IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DAVID EDWARD DIETRICH**, | Case No. 2:20-cv-01682-IM |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| **BRIGITTE AMSBERRY**, Superintendent Eastern Oregon Correctional Institution, | |
| Respondent. | |

**IMMERGUT, District Judge.**

Petitioner David Edward Dietrich ("Petitioner"), an individual in custody at Eastern Oregon Correctional Institution, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254, alleging the ineffectiveness of trial counsel. Because the Court must defer to the state postconviction court's decision denying relief on this claim, the Court DENIES the Petition for Writ of Habeas Corpus (ECF No. 1), and DISMISSES this proceeding, with prejudice.

///

PAGE 1 – OPINION AND ORDER

**BACKGROUND**

On February 15, 2007, a Washington County grand jury returned an indictment charging Petitioner with three counts of Unlawful Sexual Penetration in the First Degree; three counts of Sodomy in the First Degree; and five counts of Sexual Abuse in the First Degree. (Rept's Exs. (ECF Nos. 21, 22), Ex. 102.) The indictment alleged that Petitioner sexually abused his partner's eight-year-old granddaughter, "J.H.", on more than one occasion between June 1, 2006, and September 4, 2006.

Petitioner proceeded to trial before a jury in June 2007, where he ultimately was convicted on all counts except one count of first-degree sodomy, for which he was acquitted. (Resp't Exs. 101 at 24-28, 103-05.) After an unsuccessful direct appeal, Petitioner sought and was granted postconviction relief based on his trial attorney's ineffectiveness. (Resp't Exs. 118-19, 122, 129, 138.) The postconviction court remanded the case to the trial court for further proceedings, which are the subject of the instant petition. (Resp't Ex. 138 at 5-6.)

I.    **Trial Court Proceedings**

A.    **The State's Case**

Petitioner's second jury trial commenced in November 2013. The State built its case primarily on the testimonies of J.H., who was fifteen at the time of trial,[1] and J.H.'s parents, to whom she first disclosed the abuse.

J.H.'s mother testified that in 2006, she lived in an apartment in Tualatin, Oregon with her husband, J.H., and J.H.'s two brothers. (Resp't Ex. 113 at 65-66.) J.H.'s maternal grandmother and her romantic partner, Petitioner, also lived in the apartment. (*Id.* at 45.) Petitioner "was like a

---

[1] J.H. was born on January 29, 1998. (Resp't Ex. 113 at 34.)

family member" and acted as a grandfather to J.H., who called him "grandpa" or "papa." (*Id.* at 58, 73.)

J.H.'s mother testified that during the summer months of 2006, the children had "campouts" in the television room instead of sleeping in their shared bedroom. (*Id.* at 69.) During that time, Petitioner, who usually slept on the floor in the bedroom he shared with J.H.'s grandmother, began sleeping in an empty bed in the children's bedroom. (*Id.* at 36, 69.) As the beginning of the school year approached, however, J.H.'s mother required the children to return to their bedroom. (*Id.* at 71.) Petitioner continued to sleep in the children's bedroom despite their return. (*Id.* at 43, 71.)

J.H.'s mother testified that after the first day of school on September 6, 2006, she was getting ready to take the children to the pool when J.H. approached her and said, "Mom, if I tell you something, can I still go swimming?" (*Id.* at 72, 74.) J.H. then told her mother, "Papa touched my hoo-hoo[,]" and gestured toward her vaginal area.[2] (*Id.* at 72, 75.) J.H. also told her mother that Petitioner had "kissed her down there," and that she had "tried to keep her knees together [but Petitioner] kept pulling them apart." (*Id.* at 75.) J.H.'s mother recalled that J.H. had been upset and scared, but that she knew she needed to tell an adult because the touching was wrong. (*Id.*)

J.H.'s mother immediately informed J.H.'s father, who privately confronted Petitioner. (*Id.* at 35, 42.) Petitioner acknowledged that he had continued to sleep in the children's room and that he had moved J.H. into his bed the night before, claiming to have done so because J.H.'s brothers were fighting. (*Id.* at 42, 63.) Petitioner otherwise denied the allegations and suggested that J.H.

---

[2] J.H.'s mother confirmed during her testimony that "hoo-hoo" is J.H.'s word for her vaginal area. (Resp't Ex. 113 at 72.)

"must have been dreaming." (*Id.* at 42.) After a brief conversation, J.H.'s father asked Petitioner to leave the apartment. (*Id.* at 43.)

On September 9, 2006, J.H.'s parents reported the sexual abuse to law enforcement. (Resp't Ex. 113 at 111.) Detective Jack Rose ("Detective Rose"), the lead detective assigned to the case, referred J.H. to CARES Northwest, where she was interviewed by a child abuse interviewer on September 25, 2006. (*Id.* at 110, 112-13.) During the interview, which was recorded and played for the jury at trial, J.H. stated that on two occasions, Petitioner touched her private parts in the children's bedroom while her brothers were asleep. (*Id.* at 126, 138.) J.H. reported that Petitioner invited her into his bed on both occasions, and that he had rubbed against her, touched and kissed the "inside" of her vagina, and touched her breasts and bottom. (*Id.* at 139 -143,147, 149-55.) J.H. recalled that she had gotten up to use the restroom during the second incident and that it was 1:38 a.m. when she returned to the bedroom. (*Id.* at 159.) J.H. told the interviewer that she was too afraid to disclose the abuse after the first incident, but that she decided to tell her mother after the second incident "because [she] knew [Petitioner] had to leave[.]" (*Id.* at 138.)

Detective Rose later interviewed Petitioner. (Resp't Ex. 114 at 62.) Petitioner told Detective Rose that he had moved J.H. into his bed after her brother, with whom J.H. shared a bed, complained that she was "moving a lot" and "restless." (*Id.* at 66.) Petitioner recalled that he stayed awake for about an hour before getting into bed with J.H., and that she got up to use the restroom around 2:00 or 3:00 a.m. before returning to bed. (*Id.* at 66-67.) Petitioner repeatedly denied to Detective Rose that he had inappropriately touched J.H. and again suggested that "maybe she had a bad dream." (*Id.* at 68.)

As noted above, J.H. was fifteen at the time of Petitioner's second trial. (Resp't Ex. 113 at 172.) She testified that Petitioner sexually abused her on two separate occasions while he was

living with her family in the apartment. (*Id.* at 173.) J.H. testified that during the first incident, Petitioner put his finger inside her vagina while she was in his bed. (*Id.* at 177.) J.H. testified that during the second incident, Petitioner touched and kissed her vagina while she was in his bed. (*Id.* at 182-83.) She recalled that during the second incident, the touching stopped when she got up to use the restroom, but that Petitioner again touched her vagina when she returned to bed. (*Id.* at 187.) J.H. testified that her brothers were in the room on both occasions, but that they were asleep when the abuse occurred. (*Id.* at 178-79, 181.)

**B.      The Defense Theory**

The defense advanced a theory of reasonable doubt largely based on alleged deficiencies in the investigation and lack of corroborating physical evidence. (Resp't Ex. 113 at 25-26.) During his opening statement, Petitioner's attorney ("trial counsel") argued that Detective Rose did not "do much of anything" to investigate the case, and that there was "no evidence [that Petitioner abused J.H.] other than the fact that she made these allegations." (*Id.* at 26-30.) Trial counsel also discussed alleged shortcomings in the investigation during his cross-examination of several of the State's witnesses, including Detective Rose, who admitted that he had not interviewed J.H.'s brothers, father, or grandmother, nor visited the apartment to collect evidence for forensic evaluation. (Resp't Ex. 114 at 93-97, 106-08.)

Trial counsel then called a single witness in Petitioner's defense—defense investigator and former detective Michael O'Connell ("O'Connell"). (*Id.* at 134-35.) O'Connell testified that it did not make sense for law enforcement to forego visiting the scene to collect physical evidence because it is "pretty standard" in child sexual abuse investigations to seize relevant pieces of clothing and bedding "[i]n case there was a transfer of some kind of bodily fluid that might contain DNA evidence." (*Id.* at 137-38.) O'Connell also testified that if he had been the investigating

officer, he would have interviewed J.H.'s brothers, father, and grandmother, despite information

that those witnesses were either asleep or in another room when the abuse occurred. (*Id.* at 141-

45.)

During cross-examination, the prosecutor pointed out, and O'Connell agreed, that due to

limited resources, law enforcement must prioritize available avenues of investigation depending

on the circumstances of the case. (*Id.* at 147-49.) The prosecutor then went on to question whether

testing the bedding and clothing for DNA evidence would have meaningfully advanced the case

given Petitioner's admission that he had been in bed with J.H. (*Id.* at 149-50, 154-60.) Finally, the

prosecutor turned to Detective Rose's decision not to interview certain family members, eliciting

testimony that O'Connell also had not interviewed or subpoenaed the witnesses in question:

> **[Prosecutor]:** Did you speak with witnesses in this case?
>
> **[O'Connell]:** Yes.
>
> **[Prosecutor]:** Did you -- who did you interview?
>
> **[O'Connell]:** The -- [J.H.]'s father's brother . . . And two of [Petitioner's] sisters.
>
> . . . .
>
> **[Prosecutor]:** And Detective Rose was criticized for not speaking to the other witnesses who were present that night; why didn't you?
>
> **[O'Connell]:** That's a good question. Generally, you avoid the family, be kind of similar to I would never even consider talking to the victim. My role is in -- in other areas.
>
> . . . .
>
> **[Prosecutor]:** Part of your role would be to subpoena witnesses to come to court?
>
> **[O'Connell]:** I -- I don't have the power to issue a subpoena.
>
> **[Prosecutor]:** Okay. But would you personally serve the subpoena by defense counsel?
>
> **[O'Connell]:** Sure.

**[Prosecutor]:** If so tasked?

**[O'Connell]:** Yes.

**[Prosecutor]:** Did you do that in this case?

**[O'Connell]:** No.

**[Prosecutor]:** And part of the reason for the subpoena is to compel people who may not want to talk to you to come to Court and testify; is that right?

**[O'Connell]:** Yes.

**[Prosecutor]:** How many subpoenas did - - did you serve in this case?

**[O'Connell]:** None.

(*Id.* at 164-65.) Trial counsel did not object.

Petitioner elected not to testify.

### C.      Closing Arguments and Verdict

During his closing argument, the prosecutor reviewed the State's evidence and argued that the jury should find J.H. credible. (Resp't Ex. 115 at 23-36.) He did not mention or otherwise allude to O'Connell's investigation.

However, during trial counsel's closing, he argued, *inter alia*, that the jury would "never know what the truth is here [be]cause of the way this case was investigated." (*Id.* at 64-65.) Trial counsel then reviewed O'Connell's testimony and reminded the jury that it was the State's burden to investigate and process available evidence, not the defendant's. (*Id.* at 39-41.) In closing, trial counsel again noted that "[t]he burden [is] on the State, and on the State alone, . . . to prove this case beyond a reasonable doubt[,]" and argued that the burden could not be met, in part, because "[t]his is a case where witnesses weren't talked to; the father of the child wasn't interviewed or physical evidence seized; where the home was never visited." (*Id.* at 37, 65.)

In rebuttal, the prosecutor agreed that "[t]he State alone" bore the burden of proof, but argued that trial counsel repeatedly had asked the jury "to engage in guesswork, conjecture, and speculation[,]" and "[t]o base [its] verdict in this case on something other than evidence." (*Id.* at 67, 70-71.) The prosecutor then addressed trial counsel's arguments that Detective Rose should have investigated certain witnesses and physical evidence, noting that O'Connell had not investigated that evidence either:

> In he -- his opinion, shortcuts were taken. Now, remember he was a defense investigator on this case. The defense investigator with all that years of experience, bringing to bear -- investigating murders and homicides and I'm the guy.
>
> What did he do? He never sought to have this evidence, examined it. It [w]as available for him. He didn't even know the names of the witnesses that he thought Detective Rose should have interviewed.
>
> . . . .
>
> And, again, they have the right to put on evidence just as much as the -- and it is the State's obligation [to present evidence] in this trial. And by no means am I shirking from that responsibility.
>
> They don't have to put on evidence, but when they choose to do so, you can consider it. They had every right to subpoena witnesses. They did not bring any witnesses. They did not -- Mike O'Connel did not serve any subpoenas to have -- compel witnesses to come here and testify to you.
>
> They want you to engage in speculation, something you are specifically prohibited from doing. No, Detective Rose did not talk to people who were unconscious during the event.

(*Id.* at 71-72.) With respect to the physical evidence O'Connell testified should have been seized from the apartment, the prosecutor argued that such evidence "wouldn't have established anything contrary to what we already knew" given Petitioner's admission to having slept in the same bed as J.H. (*Id.* at 74.) In closing, the prosecutor again noted that the State is "obligated to establish this case beyond a reasonable doubt" and argued that the burden had been met because the State had presented witnesses with "compelling evidence" for the jury's consideration. (*Id.* at 77-80.)

The jury returned guilty verdicts on two counts of first-degree unlawful sexual penetration, one count of first-degree sodomy, and three counts of first-degree sexual abuse. (Resp't Exs. 101 at 5-9; 115 at 82-90.) The jury found Petitioner not guilty on all remaining charges. (*Id.*) In a separate proceeding, the trial judge sentenced Petitioner to a 300-month custodial term. (Resp't Exs. 101 at 5-9; 117 at 12-16.)

## II.   Direct Appeal

Petitioner filed a direct appeal, arguing that certain of his convictions should have been merged under state law and that the trial court erred in imposing attorney fees. (Resp't Ex. 123 at 8-9.) The State agreed that the imposition of attorney fees was in error and submitted to the trial court a Stipulated Amended Judgment, which was entered to correct the error. (Resp't Ex. 124 at 4-5.) With respect to Petitioner's merger claim, the Oregon Court of Appeals affirmed without opinion, *State v. Dietrich*, 275 Or. App. 170 (2015), and the Oregon Supreme Court denied review, *State v. Dietrich*, 358 Or. 550 (2016).

## III.   Postconviction Proceedings

Petitioner next sought postconviction relief. (Resp't Ex. 139.) In his counseled second amended petition, Petitioner raised only two claims. In his first claim for relief, Petitioner alleged that trial counsel was ineffective when he failed to object to burden shifting during the prosecutor's cross-examination of O'Connell and during the prosecutor's closing arguments. (Resp't Ex. 147 at 4-11.) In his second claim for relief, Petitioner alleged that trial counsel was ineffective when he failed to call a witness who would have testified to Petitioner's good character and reputation for sexual propriety. (*Id.* at 12-15.) Following a brief hearing, the postconviction court denied relief. (Resp't Exs. 158, 159)

Petitioner appealed, presenting a single question for review:

Is a trial attorney ineffective and inadequate for failing to object to a prosecutor's questions and closing argument that highlight the witnesses defendants could have interviewed and had testify, but failed to bring to trial?

(Resp't Ex. 160 at 8.) The Oregon Court of Appeals affirmed without opinion, and the Oregon

Supreme Court denied review. (Resp't Exs. 163, 164.)

## V.    Federal Habeas Proceedings

On November 25, 2020, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in this

Court, asserting four grounds for relief:

**Ground One:**  Ineffective Counsel at trial by failing to object to burden shifting.

**Supporting FACTS:**  Both D.A. and Defense Attorney argued the other could have called possible witnesses, but neither done it, [denying any] chance of a fair trial.

**Ground Two:**  [Trial counsel] was ineffective for failure to call any witnesses or subpoena [any] of the possible witnesses at the alleged crime scene.

**Supporting FACTS:**  In 2007 trial there was at least [five] people that should have testified but where [sic] never called den[y]ing a fair and impartial trial or appeal. [Trial counsel] could and should have called these same people, but did not.

**Ground Three:**  [Trial counsel] was ineffective counsel by failing to call Corey Holt as a character witness who had known defendant for at least [seventeen] years.

**Supporting FACTS:**  [Trial counsel]'s investigator . . . interveiewed Mr. Corey Holt and filed a subpoena but never served it.

**Ground Four:**  By Tualitan Police Det. Rose's failure to go as soon as possible to alleged crime scene to collect clothing and interviewing all possible witnesses at the scene.

**Supporting FACTS:**  If police would have collected clothing in a timely manor [sic] instead of waiting almost [seven] months to collect one pair of underware [sic] that D.A. said it may have been washed by then. By the time police were called (four days later) any contact D.N.A. evidence would have been washed away by bathing or swimming, denying defendant any chance for a fair and impartial trial.

(Pet. at 5-6.) Respondent urges the Court to deny habeas relief, arguing that the state postconviction

court's decision denying relief on Ground One is entitled to deference, and that Grounds Two,

Three, and Four are procedurally defaulted. (Resp't Resp. to Pet. (ECF No. 32), at 2.) Petitioner

addresses only Ground One in his supporting brief.

PAGE 10 – OPINION AND ORDER

## DISCUSSION

### I.  Ground One

In Ground One, Petitioner asserts that trial counsel was ineffective when he failed to object to "burden shifting." (Pet. at 5.) Specifically, Petitioner alleges that "the prosecutor's cross-examination and recalling of [O'Connell] and [the prosecutor's] closing argument shifted the burden of proof to [Petitioner,]" and that the "prejudicial questions and comments may have affected the jury's verdict." (Pet'r's Br. in Supp. of Pet. (ECF No. 35) at 14.) Respondent argues that the postconviction court reasonably rejected a similar claim in a decision that is entitled to deference. The Court agrees.

#### A.  Legal Standards

##### 1.  Deference to State-Court Decisions

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits relitigation of any claim adjudicated on the merits in state court unless such adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs if the state court correctly identifies the governing legal principle but misapplies that principle to the facts at

hand. *See id.* at 407 (holding that "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"). The "unreasonable application" clause requires the state court's decision to be more than merely erroneous or incorrect. *See id.* at 411 (noting that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). Rather, the state court's application of clearly established federal law must be objectively unreasonable. *See id.* at 409 (instructing that a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").

A federal habeas court may not disturb a state-court decision on factual grounds unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence before it. 28 U.S.C. § 2254(d)(2). Under the "unreasonable determination" clause, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Ninth Circuit has clarified that when a petitioner challenges the substance of a state court's findings, the federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.), *cert denied*, 543 U.S. 1038 (2004).

"Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the

state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Where a state court decision is issued without explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* Where, however, the highest state court issues a decision on the merits unaccompanied by its reasons for the decision, a federal habeas court must "look through" to the last reasoned decision issued in a lower state court, and presume the unexplained decision adopted the same reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

The AEDPA thus imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (simplified); *see also White v. Wheeler*, 577 U.S. 73, 76-77 (2015) (acknowledging that the "AEDPA, by setting forth necessary predicates before a state-court judgment may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court") (simplified). "The petitioner carries the burden of proof." *Pinholster*, 563 U.S. at 181.

### 2.    Ineffective Assistance of Counsel

The clearly established federal law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams*, 529 U.S. at 391 (noting that "[i]t is past question" that the rule established in *Strickland* is clearly established federal law determined by the Supreme Court of the United States). To establish a claim of ineffective assistance under *Strickland*, a habeas petitioner must satisfy a two-pronged test. First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686. Such a showing requires the petitioner to overcome a strong presumption the challenged conduct falls within the "wide range of reasonable professional

assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. The first prong thus is satisfied only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must have been "so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." *Id.* In making the prejudice determination, the court must "consider the totality of the evidence before the judge or jury." *Id.* at 695.

Where, as here, the deficient performance alleged is trial counsel's failure to raise an objection, a habeas petitioner must establish that the decision to forego objection fell below an objective standard of reasonableness, and that if counsel had objected, there is a reasonable probability that the objection would have been sustained and the outcome of the trial would have been different. *See Juan H. v. Allen*, 408 F.3d 1262, 1273–74 (9th Cir. 2005) (noting that counsel is not ineffective for failing to raise a meritless objection). However, the "failure to object during a closing summation generally does not constitute deficient performance." *Zapata v. Vasquez*, 788 F.3d 1106, 1115 (9th Cir. 2015) (citation omitted). Only where counsel remains silent in the face of "egregious" prosecutorial misconduct does the failure to object during closing argument fall below an objective standard of reasonableness. *See Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (explaining that "absent egregious misstatements, the failure to object during

PAGE 14 – OPINION AND ORDER

closing argument and opening statement is within the wide range of permissible professional legal conduct").

Analyzing an ineffective assistance of counsel claim under the AEDPA is "all the more difficult" because both standards are "highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The question under such circumstances "is not whether counsel's actions were reasonable." Rather, the court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### B.    Analysis

As noted above, Petitioner exhausted a claim similar to Ground One in his postconviction proceedings. Specifically, Petitioner argued that the prosecutor "impermissibly shifted the burden of proof from the state to petitioner" when he cross-examined O'Connell and during his rebuttal closing argument, and that "competent counsel exercising reasonable professional skill and judgement" would have objected, moved to strike, requested a cautionary instruction, or moved for a mistrial on that basis. (Resp't Ex. 147 at 11.)

The postconviction court denied relief after a brief evidentiary hearing. In a written judgment, the postconviction court noted that Petitioner failed to establish the merits of his ineffectiveness claim, explaining:

> Petitioner . . . failed to prove that the testimony and argument was improper under the United States Constitution. As in Oregon, the federal courts allow a prosecutor to comment on the defendant's failure to present exculpatory evidence so long as it does not impugn defendant's right to remain silent. This is especially true where the defense criticizes the government for failing to produce certain evidence. *United States v. Lopez*, 803 F.2d 696 (9th Cir. 1986); *Demirdjian v. Gipson*, 832 F.3d 1060 (9th Cir. 2016). In this case, the prosecutor never suggested that petitioner should have testified. He only stated that the *defense* could have presented the very witnesses and evidence that it accused the State of not presenting.

PAGE 15 – OPINION AND ORDER

> Petitioner has also failed to prove prejudice. Because there was not a basis for
> objecting, moving to strike and move for mistrial, such motions would have been
> denied, if made. Petitioner has not proven that the failure to object or make the
> indicated motions had a tendency to affect the outcome of the trial.

(Resp't Ex. 159 at 5.)

Petitioner contends that the postconviction court "unreasonably found that the prosecutor's ongoing campaign to put the responsibility for not investigating the case on the defense was not objectionable" and "did so without reference to controlling Supreme Court precedent."[3] (Pet'r's Br. at 16.) Petitioner argues that "the impropriety of the prosecutor's burden shifting was manifest" because "the prosecutor impugned the defense for not doing the prosecution's job[,]" and that under the circumstances, there was no strategic reason for trial counsel not to object. (*Id.* at 14, 16.)

Upon review, this Court concludes that the postconviction court's ruling was not objectively unreasonable. The Ninth Circuit has explained that "[a] prosecutor may call attention to the defendant's failure to present exculpatory evidence if those comments do not call attention to the defendant's failure to testify and are not of such a character that the jury would naturally and necessarily take them to be a comment on the failure to testify." *Lopez*, 803 F.2d at 973. Further, the Ninth Circuit has extended this rule to a prosecutor's comment on the defense's failure to call a witness. *See United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) (explaining that "[a] prosecutor's comment on a defendant's failure to call a witness does not shift the burden

---

[3] Petitioner contends that the Supreme Court "recognized the controlling constitutional principle" in *New Jersey v. Portash*, 440 U.S. 450, 458-59 (1979). As Respondent points out, however, *Portash* concerned whether the prosecution could use the defendant's immunized grand jury testimony to impeach the defendant if he chose to testify at trial and has little bearing on Petitioner's claim.

of proof, and is therefore permissible, so long as the prosecutor does not violate the defendants

Fifth Amendment rights by commenting on the defendant's failure to testify").

Here, trial counsel's defense strategy was to raise reasonable doubt based, in large part, on

alleged shortcomings in Detective Rose's investigation. In pursuing this strategy, trial counsel

repeatedly suggested that exculpatory evidence might have been uncovered had Detective Rose

seized clothing and bedding from the apartment for forensic testing or if he had interviewed J.H.'s

brothers, father, or grandmother. In response, the prosecutor pointed out that "O'Connell (and the

defense) could have done those same things but chose not to do so[,]" and had instead invited the

jury to speculate as to what such investigation might have produced. (Resp't Ex. 159 at 5.) In

arguing this point, the prosecutor did not comment on or otherwise implicate Petitioner's failure

to testify. Moreover, the prosecutor explained during his rebuttal closing argument that the defense

is not required to "put on evidence" and thrice reminded the jury that the burden was on the State

to prove Petitioner's guilt beyond a reasonable doubt. (Resp't Ex. 115 at 67, 71-72, 77.) Under

these circumstances, the prosecutor's questions and comments did not impermissibly shift the

burden of proof under federal law. *See Demirdjian v. Gipson*, 832 F.3d 1060, 1071 (9th Cir. 2016)

(concluding that the prosecutor did not impermissibly shift the burden of proof when the

prosecutor argued that defense counsel "had not explained the [State's] evidence with 'competent,

reliable, admissible evidence" and reminded the jury that the State "clear[ly] . . . ha[s] the burden

of proof"); *see also Cabrera*, 201 F.3d at 1249-50 (concluding that the prosecutor's comment that

the defense failed to call a witness to corroborate the defendant's account "did not shift the burden

of proof or persuasion[,]" in part because "the prosecutor reminded the jury repeatedly that the

government bore the burden of proof, and that [defendant] was not required to call witnesses");

*United States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995) (finding permissible the

PAGE 17 – OPINION AND ORDER

prosecutor's "comment on [the defendant's] failure to present exculpatory evidence" because it did not "expressly or implicitly shift[] the burden of proof[,]" and the prosecutor "expressly told the jury the burden of proof was on the government"). Thus, "[t]here was no basis for an objection or motion for mistrial on the facts of this case[,]" (Resp't Ex. 159 at 5), and trial counsel's failure to object was not ineffective, *see Juan H.*, 408 F.3d at 1273-74 (noting that counsel is not ineffective for failing to raise a meritless objection). Petitioner's arguments to the contrary are without merit.

On this record, this Court cannot conclude that the postconviction court's decision denying relief on Petitioner's burden shifting claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Accordingly, the postconviction court's decision is entitled to deference and this Court denies habeas relief as to Ground One.

## II.    Grounds Two, Three, and Four

Petitioner does not address Grounds Two, Three, or Four in his supporting brief. In addition, Petitioner does not challenge Respondent's arguments that those claims are procedurally defaulted. Accordingly, habeas relief is precluded as to Grounds Two, Three, and Four because they are procedurally defaulted, and because Petitioner has failed to sustain his burden of demonstrating entitlement to habeas relief on those claims. *See* 28 U.S.C. § 2248 (instructing that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true"); *see also Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (recognizing that a habeas petitioner carries the burden of proving his case).

///

## CONCLUSION

Based on the foregoing, the Court DENIES the Petition for Writ of Habeas Corpus (ECF No. 1), and DISMISSES this proceeding, with prejudice. Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore the Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this __22nd__ day of February, 2023.

_____
Karin J. Immergut
United States District Judge